# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 1049 - 1 | **DATE** | 8/6/2003 |
| **CASE TITLE** | | USA vs. Robert A. Burke | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion to permit material defense witness safe passage (Doc. No. 32-1) is again denied as moot. His motion for a new trial or for evidentiary hearing on the government's knowing use of false testimony (Doc. No. 184-1, 184-2) is denied. His motion for judgment of acquittal (Doc. No. 196-1) and motion for new trial (Doc. No. 187-1) are denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | **5** | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | AUG 07 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | $\mathcal{200}$ |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 8/6/2003 | |
| | | | | date mailed notice | |
| | ETV | courtroom deputy's initials | | ETV | |
| | | | | mailing deputy initials | |

FILED
03 AUG -7 AM 8:14
CLERK, U.S. DISTRICT COURT

Date/time received in central Clerk's Office

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01 CR 1049 |
| | ) | |
| ROBERT A. BURKE, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Robert Burke was charged in six counts with making false statements to the grand jury investigating a notorious crime: the 1992 escape of a federal prisoner, Jeffrey Erickson, who seized a firearm from one federal officer and murdered two others before turning the gun on himself. On November 21, 2002, a jury convicted Burke on five of the six counts. He now moves for a judgment of acquittal, for a new trial, and for an evidentiary hearing on the government's alleged misconduct. For the following reasons, Burke's motions are denied.

## DISCUSSION

I.      **Motion for Judgment of Acquittal**

A.      **Materiality of the Grand Jury Testimony**

Burke raises two arguments in support of his motion for a judgment of acquittal. First, he contends that his grand jury testimony was not material in that it was not elicited in an attempt to obtain useful information in furtherance of the grand jury's investigation. The court addressed this argument in an opinion issued on October 30, 2002, a copy of which is incorporated here by reference. As explained there, the question of whether Burke's testimony was material to a legitimate ongoing investigation is a mixed question of law and fact for the jury to decide. *See United States v. Gaudin*, 515 U.S. 506, 511 (1995). The record supports the jury's conclusion on this issue. Burke argues here, as he has before, that the government convened the grand jury for

no purpose other than a "perjury trap." He notes now that at the time he was brought before the grand jury, three other individuals had already testified and implicated Burke in providing Erickson with the handcuff key that enabled him to break free from court security personnel. But in another context, Burke himself characterizes such evidence as "uncorroborated hearsay statements by convicted felons with axes to grind or favors to cull." (Defendant's Renewed Motion for Judgment of Acquittal, at 5.) Burke argues that he had given the FBI all the information he had in a 1992 interview; but it was not unreasonable for the government to explore the possibility that Burke would be more forthcoming when immunized, as he was before giving testimony in the grand jury. Finally, as the court has observed previously, the transcript of Burke's grand jury testimony demonstrates that the prosecutor was not focusing solely on Burke's own potential involvement in the Erickson matter, but also attempting to discover what information, if any, Burke might have concerning the involvement of others.

Burke's materiality objection is overruled.

## B. Sufficiency of the Evidence on Count Five

Burke was found guilty of making false statements when he told the grand jury that he "did not" provide Erickson with a handcuff key or assist in making a handcuff key available to anyone at the Metropolitan Correctional Center ("MCC"). He now argues that the evidence was insufficient to support the verdict on this count. Burke faces an uphill battle in any sufficiency of the evidence challenge. *United States v. Graham*, 315 F.3d 777, 781 (7th Cir. 2003). Such arguments rarely succeed, and this case does not constitute the rare exception. Four persons who were incarcerated with Burke and Erickson at the MCC in 1991 and 1992 testified on this issue. Chon Won Tai testified that Burke had offered him a handcuff key and had predicted, prior to Jeff Erickson's escape attempt, that "exciting things" would be happening to Erickson. Richard Luttrell and Humberto Gil-Vidarte testified that they observed Erickson holding something they believed

to be a handcuff key; Gil-Vidarte testified that Erickson told Gil-Vidarte that the item in his hand had been given him by Burke (a statement admissible as that of a co-conspirator under FED. R. EVID. 801(d)(2)(E)).  Gil-Vidarte and Tom Hogan were witnesses to an argument between Burke and Erickson in which, according to Gil-Vidarte, Erickson promised to pay Burke for having "got you [Erickson] what you wanted." Two other inmates, Fred Rock and James Taylor, who were housed with Burke at the MCC years later, testified that Burke told them he had given Erickson the key. Tape recordings of conversations between James Taylor and his father and between Taylor and his lawyer corroborate Taylor's testimony about Burke's alleged admission.  In addition to this testimony, the government presented pages from a book found in Erickson's cell which had been cut to create a space to conceal an object in the shape of the handcuff key.

Defendant correctly notes that evidence that he told other inmates he had given Erickson the key does not amount to evidence that he actually did so.  Indeed, the government itself presented ample evidence that Defendant Burke boasted to other inmates about his power to "make things happen" that would shorten their sentences or otherwise improve their situations. Most of Burke's claims about his powers were inflated and false. The jurors were aware of these false statements, however, and the court must assume they were capable of considering the context in their assessment of the truth of Burke's alleged statements about the handcuff key.

Burke's challenge to the sufficiency of the evidence on Count Five fails.

## II.    Motion for New Trial

Burke raises a number of arguments in support of his motion for a new trial: sufficiency of the evidence; ineffective assistance of counsel; a violation of the "rule of specialty"; "outrageous government misconduct"; error in disqualifying Attorney Thomas Durkin; error in denying the motion to permit "safe passage" to Burke's material witness; error in failing to strike inflammatory surplusage from the indictment; error in failing to dismiss Count Two of the indictment as vague;

3

error in admission of "other acts" evidence; prosecutorial misconduct before the grand jury; and error in the court's rulings on pretrial motions, motions at trial, and jury instructions.

## A. Previously-Addressed Arguments

As the government observed in its consolidated response to Burke's motions, several of these arguments have been raised and addressed earlier. The court incorporates its rulings on these issues: The "rule of specialty" argument, argument concerning alleged outrageous government conduct, and argument of misconduct before the grand jury, were all addressed in the court's October 30, 2002 opinion, which is incorporated here by reference. That order did not specifically address Burke's argument that the court should have dismissed Count Two of the indictment as vague, but the court is unmoved by that argument. Count Two charges that Burke lied when he told the grand jury that he did not "ever tell an inmate that [he] could smuggle contraband into the MCC." Burke does not explain why this language is vague, nor will the court assume that either Burke himself or the jurors did not understand the meaning of the word "contraband."

The court addressed the "other acts" evidence in an order entered on October 28, 2002, also incorporated here. The court denied Burke's motion to strike "inflammatory surplusage" in a brief order on November 20, 2002, which is incorporated here.

On July 12, 2002, the court disqualified Attorney Thomas Durkin on grounds that he might be called as a witness. The court stands by its ruling on that issue, as well. In particular, the court notes the evidence that Durkin represented James Taylor at the time that Taylor obtained evidence damaging to Burke, evidence he shared with Durkin in a telephone conversation. The court notes, further, that Mr. Durkin was present in the courtroom throughout the trial. Although he did not sit at counsel table, he did participate in virtually every argument made in the jury's absence. Burke now argues that the court erred in not permitting Mr. Durkin to sit at counsel table, but he offers no

4

suggestion as to how the seating arrangement prejudiced him.

Burke has developed his sufficiency of the evidence argument only with respect to Count Five. The court has addressed that argument above, in connection with Burke's post-trial motion for judgment of acquittal. Nor will the court further amplify its pre-trial rulings, trial rulings, or rulings on instructions, where Burke has offered no further specific explanation of how the court erred.

What remain of Burke's arguments in this motion are his contention that the court erred when it failed to require the government to immunize Burke's mother and that the attorney who represented Burke when he testified before the grand jury provided ineffective assistance. The court addresses those arguments below.

### B.    Testimony of Burke's Mother

A continuing mystery in this case involves Burke's access to the handcuff key that he allegedly gave Erickson. The government's theory is that Burke's own mother obtained the key and smuggled it into the MCC. There is no dispute that Burke was entitled to attempt to refute this theory by calling his mother as a witness. Burke's mother is an Irish national, however, who reportedly will not enter the United States absent an assurance from the United States that she will not be prosecuted as a result of her testimony. The government refused any such assurance, emphasizing that under no circumstances would Mrs. Burke be immunized against a prosecution for perjury if she were to lie under oath.

Burke has expressed his concerns about his mother's testimony in different ways. Prior to trial, Burke moved for an order permitting his mother "safe passage" to the United States to permit her to testify on her son's behalf. The government represented at that time that it had no current intention to arrest Mrs. Burke on her arrival in the United States, and the court concluded that this representation rendered Burke's "safe passage" motion moot. Burke acknowledged in his pre-trial motion that a criminal defendant may not ordinarily demand that the government immunize a

defense witness who would otherwise exercise her Fifth Amendment privilege. At trial, however, Burke argued that the government's refusal to immunize his mother effectively distorted the fact-finding process in this case and therefore violated his due process rights.

A criminal defendant's right to present witnesses in his own defense constitutes a fundamental element of due process. *United States v. Hooks*, 848 F.2d 785 (7th Cir. 1988), citing *Washington v. Texas*, 388 U.S. 14, 19 (1967) and *Burris v. Young*, 808 F.2d 578, 581 (7th Cir. 1986). These witnesses must be free to testify without fear of retaliation; thus, conduct by prosecutors and judges which discourages defense witnesses from testifying can violate due process. *See, e.g., Webb v. Texas*, 409 U.S. 95, 98 (1972) (reversing a conviction where the trial judge's severe warnings to the defendant's only witness resulted in his declining to testify); *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976) (reversing a conviction where the prosecutor induced the defense witness to refuse to answer questions by making repeated stern warnings about a possible perjury prosecution); *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973) (reversing a conviction after a government agent threatened to prosecute a defense witness); *United States v. Heller*, 830 F.2d 150 (11th Cir.1987) (reversing a conviction for tax evasion where IRS agents induced defendant's accountant to testify falsely against him).

As Burke acknowledges, federal courts do not have the power to grant immunity to a witness absent a request from the United States Attorney. *United States v. Schweihs*, 971 F.2d 1302 (7th Cir. 1992), citing *United States v. Herrera-Medina*, 853 F.2d 564, 568 (7th Cir. 1988). The prosecutor's power to refuse to seek immunity is, however, limited by the defendant's right to due process. *Schweihs*, 971 F.2d at 1315, citing *Hooks*, 848 F.2d at 799. A violation of that right occurs when the prosecutor uses his or her authority to immunize witnesses with the intention of distorting the fact-finding process. *Schweihs*, 971 F.2d at 1315. In *Herrera-Medina*, the Seventh Circuit provided the following example of such a situation:

> Suppose the government had no intention of prosecuting a witness, but, wanting to deprive the defendant of that witness's testimony, threatened the witness with prosecution, at the same time refusing to grant immunity. Tactics so sharp might require dismissal of the indictment, provided the witness's testimony was important to the defense--though we know of no case that has actually been dismissed on this ground.

853 F.2d 564 at 568. Thus, although the court may not order the prosecution to immunize a defense witness, it may dismiss charges when the prosecutor's use of his power to immunize witnesses violates due process.

The Sixth Circuit applied these principles recently in *United States v. Emuegbunam*, 268 F.3d 377 (6th Cir. 2001). Defendant, a Nigerian native, was convicted of conspiracy to import heroin. He argued on appeal that the government had interfered with his ability to call his incarcerated brother to testify in his defense; the brother had refused to testify after jail officials harassed him and warned him he could be prosecuted for perjury if he were to "lie for [the defendant]." *Id.* at 399. The Sixth Circuit declined to reach the question of whether the jail guard's statements could be imputed to the United States; even if they could, the court found "no *substantial* interference with Defendant's right to call his brother as a witness his defense" where the brother had independent reasons for exercising his Fifth Amendment privilege. *Id.* at 400. Nor would the court entertain Emuegbunam's challenge to the prosecution's refusal to immunize the brother. The prosecution has a right to do so, the court noted, "when it does not wish to hinder a future criminal prosecution of the witness." *Id.* at 401, citing *United States v. Mohney*, 949 F.2d 1397, 1402 (6th Cir. 1991).

The circumstances here likewise do not support a finding of misconduct or other interference with Defendant's right to call his mother as a witness. There is no evidence of any threats or other efforts to intimidate her. Indeed, as AUSA Hogan suggested, the government might have welcomed Mrs. Burke's testimony to the extent it could have bolstered the government's arguably implausible theory: that a law-abiding elderly woman would have assisted

7

her son in criminal wrongdoing. The government does not "intimidate" a witness simply by refusing to immunize her. Nor can the possibility of a perjury prosecution be fairly viewed as interference with a witness: "The requirement of sworn testimony, backed by punishment for perjury, is as much a protection for the accused as it is a threat." *United States v. Dunnigan,* 507 U.S. 87, 97 (1993), quoted in *United States v. Griffin*, 310 F.3d 1017, 1024 (7th Cir. 2002).

To this court's best understanding, Mrs. Burke chose not to appear and give testimony on the advice of her own attorneys. The court perceives no obligation on the part of the prosecution to immunize her. At a minimum, its refusal to do so did not constitute a denial of due process.

### C. Ineffective Assistance of Counsel

Upon Burke's arrival in the United States after extradition, Attorney Michael Falconer was appointed to represent him. Burke now argues that Falconer's failure immediately to recognize that the court had erred in sentencing Burke back in 1993 constituted ineffective assistance: "Had Mr. Falconer realized the illegality of the sentence, the government would not have been in a position to detain Defendant in the first instance, could not have successfully indicted him, and would have been required to release him and permit him to return to London under the 'rule of specialty.'" (Defendant's Motion for New Trial, at 2.)

The circumstances here demonstrate that regardless of the alleged impropriety of Burke's original sentence, the requirement that he appear before the grand jury can not meaningfully be attributed to any action or inaction of Attorney Falconer. Falconer was appointed by Magistrate Judge Bobrick on December 22, 2000, the day of Burke's arrival here, but after he had been served with a grand jury subpoena. The fact that Burke's 1993 sentence was improper would not relieve him of his obligation to comply with the subpoena in January 2001. Burke has not explained why, even if Falconer had realized immediately that Judge Lindberg mistakenly applied the Sentencing Guidelines to a pre-Guidelines offense in 1993, Burke would have been excused from appearing

before the grand jury. Nor does Burke suggest that his grand jury testimony (which the jury has found to be perjurious) was the product of any advice Falconer gave or failed to give him.

## III.   Motion for New Trial Based on Use of False Testimony

Finally, Burke moves for a new trial on grounds that AUSA William Hogan allegedly knowingly introduced the false testimony of Chong Won Tai, who was incarcerated with Burke at the MCC in 1991 and 1992, that he had met Burke's parents in the MCC visiting room. Burke insists this testimony was false and asserts that an MCC visiting room schedule demonstrates this. Tai, housed on the 19th floor, was scheduled for the visiting room on Wednesdays, whereas 17th floor residents including Burke, were scheduled for such visits on Fridays and Sundays.[1]  Tai testified on redirect examination that he was also entitled to be in the visiting room on any day for a visit with his attorney. Burke points out, however, that visits with attorneys took place in private meeting rooms off the main visitors area and would not afford Tai access to Burke's family visitors.

Whatever the MCC standard schedule for visiting may have been, MCC records and Tai's own contemporaneous calendar notes reflect that Tai was in fact present in the visiting room on four separate occasions: twice when Burke's parents were there, another when Burke's mother was there, and yet another when Burke's father was there. Defense counsel did not explore Tai's assertion (expressed in Tai's uncertain English) that he was able to obtain access to the MCC visiting room when Korean lawyers, not assigned to his case, were there to visit other inmates. Finally, the court notes that the fact that Burke's parents visited him is not disputed. Nor did Tai testify that he had observed Mrs. Burke give Defendant a handcuff key; he referred to Mrs. Burke as a "nice lady."

Tai's testimony was not apparently false at all, however; and Burke's attorney amply cross-

---

[1]      As Government Exhibit Tai 6 reflects, Tai was also housed for a portion of 1992 on the 21st floor of the MCC, as Tai testified in response to questions from Burke's own attorney. But the visiting room schedule for 21st floor residents also did not overlap with Burke's.

examined Tai on the purported inconsistencies in his testimony. The motion for a new trial on this basis is denied.

## CONCLUSION

For the reasons set forth here, Defendant's motion to permit material defense witness safe passage (Doc. No. 32-1) is again denied as moot. His motion for a new trial or for evidentiary hearing on the government's knowing use of false testimony (Doc. 184-1, 184-2) is denied. His motion for judgment of acquittal (Doc. 196-1) and motion for new trial (Doc. 187-1) are denied.

ENTER:

Dated: August 6, 2003

REBECCA R. PALLMEYER
United States District Judge

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 1049 - 1 | **DATE** | 7/12/2002 |
| **CASE TITLE** | USA vs. Robert A. Burke | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/2/2002 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ■ Trial set for 10/7/2002 at 9:30 A.M..

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Government's motion to disqualify (26-1) is granted. Mr. Durkin is disqualified from serving as trial counsel in this matter, and the court directs that he take steps within the next four weeks to assist Mr. Halprin in preparing to serve as sole trial counsel.

(11) ■ [For further detail see order on reverse side of the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | 5 | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 15 2002 | | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | docketing deputy initials | 52 |
| | Mail AO 450 form. | | U.S. DISTRICT COURT CLERK | 7/12/2002 | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| ETV | courtroom deputy's initials | | 02 JUL 12 PM 3:37 FILED Date/time received in central Clerk's Office | ETV mailing deputy initials | |

The United States moves to disqualify Attorney Thomas A. Durkin from further representation of Defendant Robert Burke in an indictment for perjury. In support of this motion, the government notes that two of Mr. Durkin's own prior clients will be witnesses against Mr. Burke. One of those witnesses has refused to waive privilege in order to permit Mr. Durkin to cross-examine him. To address this concern, Attorney Rick Halprin has filed his own additional appearance on behalf of Mr. Burke and represents that he alone would conduct the cross-examination of any witness previously represented by Mr. Durkin.

Although Mr. Halprin's appearance satisifies one concern, the government has raised a second one: that it is reasonably likely that Mr. Durkin will be called as a witness in this case. To demonstrate the conflict, the government has furnished the transcript of a taped telephone conversation between Mr. Durkin and one of the prior clients who will be a witness here. In that telephone conversation, Mr. Durkin and the client discussed the government's investigation of the perjury charges against Burke, and the client made statements that, according to the government, are consistent with the client's grand jury testimony. The government contends, and the court agrees, that the substance of that conversation will corroborate its proof that certain statements Defendant Burke made before the grand jury were false. Mr. Durkin's participation in that conversaton renders it reasonably foreseeable that the government will seek to call him as a witness in this case.

The dual role of an attorney as witness and advocate is disfavored. This court's Local Rules provide that if a lawyer "reasonably should know that the lawyer may be called as a witness other than on behalf of the client, the lawyer may act as an advocate in a trial or evidentiary proceeding unless the lawyer knows or reasonably should know that the lawyer's testimony is or may be prejudicial to the client." LR 83.53.7(b). In this case, the court notes that the government claims Mr. Burke commited perjury by lying before the jury, not about what he did, but about what he said to others. The conversation between Mr. Durkin and a witness/client relates precisely to that matter: what Mr. Burke said to others. The court believes that Mr. Durkin's testimony concerning this conversation would in fact be prejudicial to his client. For this reason, Mr. Durkin is disqualified from serving as trial counsel in this matter, and the court directs that he take steps within the next four weeks to assist Mr. Halprin in preparing to serve as sole trial counsel.

Although the Rule prohibits a lawyer who will be called as a witness from acting "as advocate in a trial or evidentiary proceeding," the Rule explicitly also provides that "nothing in this rule shall be deemed to prohibit a lawyer barred from acting as advocate in a trial or evidentiary proceedings from handling other phases of the litigation." LR 83.53.7(c). Although the court's comments at the hearing on this motion suggested otherwise, this language permits Mr. Durkin's continued involvement in Mr. Burke's representation and continued contacts with him in preparation for trial. To the extent the court directed that Mr. Durkin cease all involvement at a future date, those comments are withdrawn. The court nevertheless expects and requests that Mr. Durkin and Mr. Halprin will promptly devote attention to bringing Mr. Halprin fully "up to speed" on trial preparation issues. In this court's view, the "perjury trap" arguments are legal issues that do not implicate Mr. Durkin's status as a potential witness, and he is not disqualified from arguing those issues to the extent they are not matters for the jury's consideration at trial.

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 1049 - 1 | **DATE** | 10/28/2002 |
| **CASE TITLE** | USA vs. Robert A. Burke | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motions for safe passage, for early return of subpoenas, for immediate disclosure and for additional time (Doc. 31-2, 33-1, 34-1, 38-1) are stricken as moot. The government's motions to admit "other act" evidence and intricately related evidence (Doc. 97-1, 98-1, 2) are granted in part and denied in part. Its motion to admit co-conspirator statement (Doc. 106-1) is granted, and motion to admit statements of unavailable witness (Doc. 106-2) is denied. Enter Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 2 9 2002 | 122 |
| | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | 10/28/2002 date mailed notice | |
| ETV | courtroom deputy's initials | 20 OCT 28 PM 4: 15 | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. **DOCKETED** | ) | No. 01 CR 1049 |
| | ) | |
| ROBERT A. BURKE    OCT 2 9 2002 | ) | Judge Rebecca R. Pallmeyer |

## ORDER

Several pretrial motions remain pending in this case. This order clarifies the court's determinations.

### "Intricately Related" or Rule 404(b) Evidence

First, the government has moved for admission of certain evidence involving Burke's contacts with inmates other than Erickson as "intricately related" evidence or as evidence of "other acts" admissible under Rule 404(b). Specifically, the government seeks to introduce evidence that in late 1991 and 1992, Burke offered to provide services in return for cash to persons referred to here as "Inmate A" and "Inmate C." With respect to Inmate C, the government expects the evidence will show that Burke made two offers: first, that in return for $350,000, he (Burke) could connect C with an attorney capable of improperly influencing a federal judge; and, second, that Burke could furnish C with a handcuff key for $10,000. With respect to Inmate A, the government expects to demonstrate that Burke offered to obtain a passport for A. He also allegedly offered to provide Inmate A with medicine that would make him ill or otherwise support a request for a reduction in A's sentence. Finally, Burke allegedly told A that Burke could influence the judge in A's case in return for $400,000.

Under Federal Rule of Evidence 404(b), the court may admit evidence of other crimes or wrongs for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The parties here agree that under Seventh Circuit law, the court must apply a four-part test for determining whether evidence is admissible under this

122

Rule. *See United States v. Montani*, 204 F.3d 761 (7th Cir. 2000); *United States v. Bursey*, 85 F.3d 293, 297 (7th Cir. 1996). In this court's view, with one exception, that test is met here. First, the evidence is directed toward establishing matters in issue other than Burke's propensity to commit the acts charged in this case: specifically, Burke's motive to obtain money from other inmates and his plans or methods for doing so. As required by the test, the other acts are similar enough and close enough in time to be relevant here, and the court does not believe that the evidence would be so prejudicial as to outweigh its probative value.

The remaining prong of the test requires the court to determine whether the evidence is such that the jury could find by a preponderance that the other acts occurred. With respect to Inmate C, the government asserts it will offer not only testimony but documentary proof. With respect to Inmate A, the court notes that he reported conversations concerning the passport and medicine in 1992, but did not describe the proposed $400,000 transaction until September 2002. The court is suspicious of this late disclosure, and will sustain Burke's objection to testimony concerning that transaction without prejudice. Before the court will admit such evidence, the court will hear the testimony outside the presence of the jury.

A second motion to admit "other act" evidence describes Burke's involvement in a fraud on the Continental Bank and the Barbary Bank. The court concludes that the details of those frauds are inadmissible. The government is entitled to introduce evidence that Burke faced substantial financial obligations as a result of his wrongdoing, but the manner and method in which he defrauded banks is not "probative of Burke's motive and method of operation in seizing upon money making opportunities in the MCC." (Government's Motion to Admit "Other Act" Evidence, Oct. 2, 2002, at 9.) Indeed, the court is uncertain whether the government expects to introduce details; its motion concludes by asserting that it will "present only minimal information to the jury about the events." With respect to this evidence, the court stands by its conclusion that, as ordered on September 27, 2002, the jury will be advised only that Burke was convicted of a felony

and that he faced a significant financial obligation as a result. Burke objects to introduction of evidence that his mother paid certain debts for him, including debts he incurred in the name of his second wife. For reasons explained orally, this court does not believe evidence of his mother's assistance, even to a grown son, is prejudicial. The court sustains Defendant's objection to any evidence challenging the validity of that second marriage. The court also agrees with Defendant that the government will not be permitted to use the evidence concerning Burke's wife and mother so as to portray him as an individual who takes advantage of or otherwise abuses women.

**Co-Conspiratory Statements and Statement of Unavailable Witness**

The government has moved to admit statements of a co-conspirator referred to as Witness A. Defendant Burke argues that if such evidence is admissible, then so also is a statement by inmate Michael Veysada. The court agrees. The statements of both of these alleged co-conspirators will be admitted.

In addition, the government has asked the court to admit the grand jury testimony of Andrew Grill, now deceased, who gave testimony adverse to Burke before the grand jury. For reasons explained orally, the court sustains Burke's objection to this testimony. Grill, a convicted felon, gave this testimony hoping for some consideration with respect to his sentence. If he were to testify before the jury, defense counsel would be free to cross-examine Grill concerning his criminal record and his reputation for honesty, and the jury would be advised that it should consider his testimony with "caution and great care." Grill's unavailability deprives Burke of his important right of confrontation. The circumstances of Grill's death generate further concern, as they demonstrate that Grill had not turned from a life of crime at the time he gave his grand jury testimony: Grill committed suicide when FBI agents were about to arrest him for yet another bank robbery. Finally, as Defendant Burke notes, the government did not demonstrate that the evidence Grill would offer is unavailable from other witnesses. Grill himself testified that Sterling Smith was present "during

at least one of the conversations in which [Grill claims] Burke and Erickson discussed future escape plans."

**Miscellaneous Pretrial Matters**

Some time ago, Burke moved for an order permitting his mother "safe passage" to the United States. In response, the government stated that it has no current intention to arrest Mrs. Burke upon her arrival in the United States. The court concludes this representation renders the motion (Doc. 32-1) moot. The court concludes, further, that both parties have met their discovery obligations. Burke's motions for early return of trial subpoenas and for immediate disclosure of favorable evidence (Doc. 33-1, 34-1) and the government's motion for reciprocal discovery are also moot, as is Burke's motion for an extension of time to file additional pretrial motions (Doc. 38-1).

## CONCLUSION

Defendant's motions for safe passage, for early return of subpoenas, for immediate disclosure and for additional time (Doc. 32-1, 33-1, 34-1, 38-1) are stricken as moot. The government's motions to admit "other act" evidence and intricately related evidence (Doc. 97-1, 98-1, 2) are granted in part and denied in part. Its motion to admit co-conspirator statements (Doc. 106-1) is granted, and motion to admit statements of an unavailable witness (Doc. 106-2) is denied.

ENTER:

Dated: October 28, 2002

REBECCA R. PALLMEYER
United States District Judge

4

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 1049 - 1 | **DATE** | 10/30/2002 |
| **CASE TITLE** | USA vs. Robert A. Burke | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion regarding the grand jury (36-1) and motion for an evidentiary hearing (45-1) are granted in part and denied in part. His motion to suppress grand jury statements (44-1) and motions to dismiss the superseding indictment (44-2, 45-2) are denied. Finally, Defendant's renewed request for production of grand jury minutes is granted in part and denied in part. His renewed request for an evidentiary hearing and renewed motion to dismiss superseding indictment are denied. Enter Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | OCT 31 2002 | |
| | Notified counsel by telephone. | | | date docketed | 137 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | | | 10/30/2002 | |
| ETV | courtroom deputy's initials | | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | ETV mailing deputy initials | |

**DOCKETED**

OCT 3 1 2002

UNITED STATES OF AMERICA )
)
v. ) No. 01 CR 1049
)
ROBERT A. BURKE ) Judge Rebecca R. Pallmeyer

## ORDER

On July 20, 1992, Jeffrey Erickson, a defendant on trial on bank robbery charges, attempted to escape from federal custody. Erickson managed to unlock his handcuffs, seize an officer's weapon and murder two security guards before turning the gun on himself. Defendant Robert Burke has been charged with six counts of perjury in connection with his testimony before the grand jury investigating the Erickson incident. In this opinion, the court addresses briefly Mr. Burke's objection to the jurisdiction of this court over him and his claim that the grand jury proceeding was a "perjury trap." In an order entered on Monday, October 28, 2002, the court resolved certain pre-trial matters raised in the parties' remaining motions.

### Objection to the Jurisdiction of the Court

In August 1991, Burke was indicted in Chicago on bank theft charges arising in part out of conduct in 1986 and 1987. Burke pleaded guilty on September 14, 1992, to three counts of bank theft, and on March 3, 1993, Judge Lindberg of this court sentenced him on two of the counts to five year custody terms, to run concurrently, followed by five years of supervised release on each count, also to run concurrently. That same day, Judge Zagel sentenced Burke to 14 months on the third charge to which he had pleaded guilty, followed by 60 months of supervised release, all to run concurrently with the sentence imposed by Judge Lindberg.

At some point after March 3, 1993, Burke was released to a Salvation Army facility. By July 9, 1994, he was released from that facility to begin serving the term of supervised release. Burke reported to his probation officer as scheduled on August 23, 1994. Soon afterwards, Burke's father

*137*

reported that he had not seen his son since August and did not know where he was. At the government's request, the court issued a warrant for Burke's arrest on charges of violation of supervised release, and he was a fugitive for the next four years, during which time the government filed a new criminal complaint against him for a fraud he had committed while at the Salvation Army facility.

On September 4, 1998, Burke was apprehended in London and ordered detained. The British court ordered Burke extradited on the supervised release violation but concluded that the fraud charge did not support extradition because English law does not recognize a comparable criminal offense. Burke appealed the extradition order. As reflected in documents submitted by the government and by Burke's attorneys in this case, the English authorities struggled with what appeared to be the novel issue of whether extradition is appropriate where the individual whose extradition is sought has already served the custodial portion of his sentence and has merely failed to comply with the conditions of supervised release. (The government now challenges the understanding that at the time of the appellate decision, Burke had served the custodial portion of his sentence "in full," but acknowledges that this was the understanding of the parties during the extradition proceedings.) Ultimately, the extradition order was upheld by the House of Lords on appeal and on December 22, 2000, the British authorities transferred Burke to the custody of United States Marshals. Burke's English counsel has continued to challenge the propriety of his removal, filing a written protest with the British Home Office earlier this year. It is undisputed, however, that to date that Office--which is, to this court's understanding, the entity which would assert Great Britain's objection, if any, to Burke's extradition--has neither made any such formal objection nor otherwise sought Burke's return.

On January 9, 2001, Judge Lindberg directed the government and Burke's attorney to file briefs on the government's motion for a rule to show cause why Burke's supervised release should not be revoked. Several months later, on June 26, 2001, Judge Lindberg granted the motion and

2

revoked Burke's supervised release; he directed the parties to file written submissions concerning the appropriate sentence for Burke's violation. In the process of preparing that written submission, AUSA Diane MacArthur for the first time recognized an error in the sentence that had been imposed on Burke in 1993: specifically, because the two charges on which Judge Lindberg sentenced Burke arose from conduct that occurred prior to November 1, 1987, Burke's sentence on those charges should not have been calculated under the United States Sentencing Guidelines. The Sentencing Guidelines were not in effect prior to November 1, 1987. For that reason, a period of supervised release (a creation of the Guidelines) should not have been imposed on Burke at all. AUSA MacArthur immediately notified the court and Burke's attorney of the mistake, and the parties briefed the effect of this mistake on the government's motion for revocation. On December 5, 2001, Judge Lindberg vacated the supervised release portion of Mr. Burke's sentence. His written order declared that portion of the sentence as vacated "ab initio."

Defendant Burke is suspicious of these circumstances. In repeated submissions to the court, he has argued that the circumstances demonstrate that the government acted in bad faith in its efforts to extradite him and suggested that government officials knew but deliberately hid their knowledge that as a pre-Guidelines offender, Mr. Burke was not subject to a sentence that includes a term of supervised release. At a minimum, Burke insists, the court should conduct an evidentiary hearing to determine, in effect, "what did the government know, and when did the government know it?" For several reasons, however, the court finds no basis to go beyond the parties' written submissions, which satisfy the court that although regrettable, the sentencing error and related extradition proceedings do not reflect bad faith.

First, there is no basis to conclude the government improperly sought a Guidelines sentence. In the Government's Version she submitted for sentencing, AUSA MacArthur noted that the case was a pre-Guidelines case and made no sentencing calculations or recommendation. The Probation Officer also utilized pre-Guidelines standards in calculating the custody portion of Burke's

3

sentence. The Probation Officer's report also included information concerning supervised release terms available under the relevant statutes on each of the three charges, but then noted explicitly that the Guidelines "only pertain to Indictment No. 92 CR 51," that is, the indictment on which Judge Zagel sentenced Burke. Ms. MacArthur herself was on trial in another courtroom on March 3, 1993, and was not present when Judge Lindberg imposed a sentence of five years on the two counts before him, followed by five years of supervised release. As the government notes in its submissions to this court, even if the Guidelines had applied to the two counts before Judge Lindberg, a supervised release term on either count should have been no longer than three years.

Although a Guidelines sentence is arguably more severe than the appropriate pre-Guidelines sentence, the court notes that the Bureau of Prisons treated Burke as though he had in fact been sentenced to a pre-Guidelines term. When he had (with credit for time served since his arrest) been incarcerated for approximately half of his five-year sentence, he was released. On July 8, 1994, Burke signed a Certificate of Parole reflecting his July 8 release date and the fact that he had a total of 915 days remaining on his five-year term.

Because the extradition effort rested on Burke's violation of supervised release, the government could arguably have had a motive to conceal the sentencing mistake until after Burke's return to the United States. Burke offers nothing that would establish that the government had such a motive at the time of his sentencing, however, and the government's written submissions belie such a motive. Burke does not suggest that he acted in reliance on any sentencing mistake in choosing to flee the jurisdiction within a few weeks of executing the Certificate of Parole. The Probation Officer referred to Burke's failure to report as a violation of his supervised release, and AUSA MacArthur referred to Burke's conduct as a violation of his supervised release in her motion for a rule to show cause – long before she or any other government officer was aware that Burke had left the country and that an extradition proceeding would be required to bring him back. Nor has Burke confronted the fact that neither the probation officer, nor the court itself, nor Burke's own

4

attorneys, here or abroad, ever raised the matter of an improper or unlawful sentence until AUSA MacArthur caught the mistake and promptly brought it to the court's attention.

Any mistake in the government's or the courts' administration of criminal justice is improper and regrettable. This court concludes no further hearing into this matter is appropriate or required, however, because any improprieties in the government's efforts to extradite Burke do not constitute a defense to the court's jurisdiction over him on perjury charges. Under the provisions of the extradition treaty and the doctrine of "specialty," the government was permitted to prosecute Burke only for the offense that was the basis of his extradition. Extradition Treaty, U.S.-Gr. Brit., 28 U.S.T. 227 at art. XII (entered into force on June 21, 1977). The government repeatedly acknowledged the prohibition against prosecution of Burke for other crimes in its communications with Burke's lawyer and its submissions to the court after his extradition here. The Treaty expressly provides, however, that the prohibition against other prosecutions does not apply to offenses committed after the extradition. *Id.* at XII (2). The charges that form the basis for the superseding indictment in this case arise out of testimony Burke gave in the grand jury on October 2, 2001. On that day, Burke was brought before Acting Chief Judge Kocoras and, in the presence of his attorney, immunized pursuant to 18 U.S.C. § 6002. Following immunization, Burke appeared before the grand jury and answered questions concerning his knowledge of persons who may have assisted Jeffrey Erickson's escape attempt and about whether he (Burke) had made statements to other inmates concerning the Erickson incident. On December 5, 2001, Burke was charged with perjury in a criminal complaint. Six days later, he was indicted on a single perjury count. On March 12, 2002, the grand jury returned a superseding indictment charging Burke with six counts of perjury. Beyond determining that Defendant Burke has been advised of the charges against him and conducting a fair trial, the court will not investigate the methods used to extradite him or otherwise to bring him under the court's jurisdiction. Citing *Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir. 1990), the government here urges that absent an objection from British

5

authorities, Burke has no standing to enforce extradition treaty provisions. In *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), the Supreme Court did consider the defendant's objection to prosecution on the ground that United States authorities had forcibly abducted him in Mexico to bring him before a U.S. court. The Court concluded the kidnapping was not a violation of the treaty and reversed an order dismissing the indictment. In that case, this court notes, Mexican authorities had filed a formal protest of the U.S. proceeding. Here, where Burke's extradition has been upheld on review in England, the court will not on its own explore improprieties concerning the government's conduct in bringing Burke before the court. As the Seventh Circuit has explained:

> It has long been held that due process has been satisfied when a person is apprised of the charges against him and is given a fair trial. The power of a court to try a person is not affected by the impropriety of the method used to bring the defendant under the jurisdiction of the court. *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). Once the defendant is before the court, the court will not inquire into the circumstances surrounding his presence there. *United States ex rel. Calhoun v. Twomey*, 454 F.2d 326, 328 (7th Cir. 1971).

*United States v. Marzano*, 537 F.2d 257, 271 (7th Cir. 1976).

Burke makes much of what he deems the unusual posture of this case and its importance to the government. He notes, for example, that the government has never denied his assertion that it is unusual for the United States to seek extradition of an individual guilty only of violating the terms of supervised release. Indeed, these circumstances potentially support an inference that the government sought Burke's return not because he had failed to report to his probation officer but because the government suspected his involvement in the Erickson episode. As Burke's lawyers acknowledged in court, however, the government is "legally entitled" to file these charges, a concession that ends the court's inquiry. Courts will not inquire into the prosecution's motives unless there is a showing of selective enforcement, *United States v. Batchelder*, 442 U.S. 114, 125, (1979), or an attempt to discriminate by arbitrary classification, *Wayte v. United States*, 470 U.S. 598, 608 (1985). *See Schellenbach v. Securities Exchange Commission*, 989 F.2d 907, 912 (7th

Cir. 1993). The government's belief that Burke had information concerning Erickson's 1992 escape attempt meets neither of these tests.

For these reasons, this court denied Burke's formal objection to the jurisdiction of this court and demand for immediate release (Doc. No. 5-1) on October 15, 2002.

### The "Perjury Trap" Argument

Apart from improprieties concerning his extradition from England, Burke has argued that the court should dismiss the perjury charges against him because the government's conduct constituted a "perjury trap." The Ninth Circuit has explained that a "perjury trap" is created when the government calls a witness "for the primary purpose of obtaining testimony from him in order to prosecute him later for perjury." *United States v. Chen*, 933 F.2d 793, 796-97 (9th Cir.1991). As the cases recognize, the existence of a legitimate basis for an investigation and for particular questions answered falsely precludes "any application of the 'perjury trap' doctrine." *Wheel v. Robinson*, 34 F.3d 60, 67 (2d Cir. 1994). Put another way, the perjury trap doctrine has no application in circumstances when the government elicits testimony before a grand jury that is "attempting to obtain useful information in furtherance of its investigation", or "conducting a legitimate investigation into crimes which had in fact taken place within its jurisdiction." *United States v. Brown*, 49 F.3d 1162, 1168 (6th Cir. 1995), citing *United States v. Devitt*, 499 F.2d 135, 140 (7th Cir. 1974) and *United States v. Chevoor*, 526 F.2d 178, 185 (1st Cir. 1975).

There is no dispute here that a serious crime had taken place in this jurisdiction—Erickson's attempted escape from federal custody and his murder of two federal officers. Defendant Burke's "perjury trap" argument suggests that the grand jury was not conducting a "legitimate investigation" into that crime, but the court is not persuaded. First, the questions Burke was asked were not limited to Burke's own potential involvement in the Erickson matter; many of them were designed to elicit information Burke might have concerning the involvement of others. Thus, the prosecutor

first reminded Burke in several ways that he was immune from prosecution for any role he might have had in Erickson's attempted escape, but not for any perjured testimony he might give to the grand jury. (Transcript of Robert Burke's Grand Jury Testimony, at 3-5.) She then proceeded to ask him numerous questions, not only about his own potential involvement, but also that of other inmates and guards, in obtaining a key or otherwise assisting Erickson:

Q.     Did you ever talk to any other inmates prior to the escape attempt about any ideas or plans that Mr. Erickson had . . . by way of escape?
. . . .

Q.     Did you talk to any other inmates about a handcuff key?
. . . .

Q.     Did you talk to any inmates about any type of key at all?
. . . .

Q.     Do you know of anyone in the MCC who hid a handcuff key during the period of time that you were there?
. . . .

Q.     Do you know of anyone in the MCC who had information about the hiding of a handcuff key?
. . . .

Q.     Do you know of anyone who transported a handcuff key from the visiting room to another location at the prison?
. . . .

Q.     Did you supply the key that's shown in the grand jury exhibit to Mr. Erickson or anyone else at the Metropolitan Correctional Center?
. . . .

Q.     Do you know of anyone who hid a key of any sort for Mr. Erickson?
. . . .

Q.     Do you know of anyone else who has knowledge about Mr. Erickson's escape attempt?
. . . .

Q.     Do you have any knowledge of anyone other than officers bringing contraband or other unauthorized items into the MCC in order to get them to an inmate?
. . . .

Q.     Do you have any specific knowledge of any particular officers who were involved in bringing materials to inmates during that period of time?
. . . .

Q.     Can you give us names of officers who you know have brought items into the MCC on a prisoner's behalf?
. . . .

Q.     Do you have any knowledge that any of those individuals that you've identified [persons involved in organized crime and gang leaders] were responsible for bringing a handcuff key into the MCC?
. . . .

Q.     Did you ever hear that anyone associated with organized crime had been

> responsible for getting a handcuff key into the MCC?
>
> . . . .
>
> Q.  Have you heard anything about anyone assisting Mr. Erickson in any way while he was in the prison?
>
> . . . .
>
> Q.  What rumors have you heard?
>
> . . . .
>
> Q.  [W]hat was the specific rumor about [Erickson's cellmate] Sterling Smith and any desire or situation he was faced with as it related to Mr. Erickson's escape attempt?
>
> . . . .
>
> Q.  Did you ever hear any specific rumors that Mr. Smith assisted Mr. Erickson in the escape attempt?
>
> . . . .
>
> Q.  Did you hear any other rumors concerning other inmates and Mr. Erickson's escape attempt?
>
> . . . .
>
> Q.  Did you hear those rumors – did those rumors include reference to any specific names?
>
> . . . .
>
> Q.  Have you ever at any time made known the names that you had heard?
>
> . . . .
>
> Q.  You pointed the finger at officers as being the source of getting the contraband into the MCC. Were inmates also able to get contraband in through family members or other visitors?

(*Id.* at 15-34.) Burke could not assert that questions such as these were not "material or germane" to the grand jury's investigation of the Erickson matter. *Cf. United States v. Crisconi*, 520 F. Supp. 915, 920 (D.Del. 1981); *United States v. Nickels*, 502 F.2d 1173, 1176 (7th Cir. 1974) (stating that where questions posed to the witness were material to a legitimate grand jury investigation, there can be no perjury trap). He nevertheless sees a "perjury trap" in the prosecutor's questions because, he insists, his own story concerning Erickson's attempted escape has not changed since he was interviewed years earlier. As the government notes, its earlier interview of Burke was far less informed than was the inquiry made before the grand jury because inmates who have now implicated Burke had not been interviewed at the time of Burke's earlier statements. In any event, it was not unreasonable for the government to explore whether the grant of immunity might move Burke to provide more information, if not about his own activities, then at least about the involvement of other persons.

9

In Burke's view, the court should not accept the government's representations about the scope of the grand jury's inquiry but should instead explore the matter by way of an evidentiary hearing. Recognizing that exploration of grand jury activities is discouraged, *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 443 (1983), on October 15, 2002, the court nevertheless directed the government to produce for *in camera* review the grand jury transcripts from June 12, 2001 forward. A review of the sworn testimony confirms the court's understanding of the scope of the grand jury's efforts. Agent Larson testified on June 12, 2001 that "the investigation [is] still ongoing because it is the hope that you [the FBI] will be able to find out as much as you can about what actually happened that day and who was involved besides Mr. Erickson in the escape attempt." (Transcript of John Louis Larson's Grand Jury Testimony, at 22.) He asserted, further, that he still hoped that charges might some day be brought against any person who had assisted in the escape effort. (*Id.*) Agent Richard Hardgrave, who testified on March 12, 2002, regarding the "materiality" of Burke's testimony, agreed under oath that the "the grand jury—again now or in the past—[was] attempting to discover who was involved, how the handcuff key got in, who may have assisted Mr. Erickson in the escape attempt or in its planning or in the smuggling of contraband in the prison." (Transcript of Richard Davis Hardgrave's Grand Jury Testimony, at 40.) Hardgrave testified, further, that it was also part of the grand jury's investigation "to determine whether Mr. Burke knew of anyone else who may have done those things—that is talk to Erickson, helped him, assisted him, advised him, smuggled in a key or even hid the key once it was inside." (*Id.* at 41.) A grand juror asked one of the inmate witnesses "where he [Burke] got the key from," specifically exploring whether it was "from a guard or from another prisoner." (Transcript of March 5, 2002 Grand Jury Testimony of an Inmate, at 21-22.)

At trial on these charges, the question of whether Burke's testimony was material to a legitimate ongoing investigation is a mixed question of law and fact for the jury, not this court, to decide. *United States v. Gaudin*, 515 U.S. 506, 511 (1995). This court has explored the issue only

10

in response to Burke's insistence that the grand jury was convened for no purpose other than a "perjury trap." The court concludes only that the record is adequate to support the conclusion that at the time of Burke's testimony, the grand jury's investigation was not limited to the issue of his truthfulness.

**Renewed Motion to Dismiss Count Five**

Although the government asserts that Burke's lawyers had access to the grand jury transcripts well before this court requested them, counsel devoted particular scrutiny to those transcripts in the last days before trial. As his attorneys explained at a conference on Tuesday, October 22, 2002, Burke is troubled by the testimony given by FBI Agent Richard Hardgrave before the grand jury on March 12, 2002, the day that the grand jury returned a superseding indictment. In that superseding indictment, Burke is charged not only with having given false testimony concerning conversations with other inmates, but also having given false testimony about his own direct involvement in the Erickson escape attempt. Specifically, in Count Five of the superseding indictment, the grand jury charges that Burke testified falsely when he answered these questions:

> Q. Did you provide Mr. Erickson with a handcuff key?
> A. No, I did not.
> Q. Did you assist in any way in making a handcuff key available to any inmate at the MCC?
> A. No, I did not.

(Transcript of Robert Burke's Grand Jury Testimony, at 15.) To prove that this testimony was in fact perjurious, the government will have to prove that Burke did in fact furnish Mr. Erickson with a handcuff key or assist in making it available to him. It appears that the evidence presented to the grand jury in support of that count consists essentially of the testimony of other inmates that Burke told them he had done so. At that March 12, 2002 grand jury session, at least one grand juror probed the matter with Agent Hardgrave, as reflected in this question and answer:

> Q. The other witnesses claimed that Mr. Burke had told him that he could get contraband and the key from his parents bringing them into the MCC. Since

> they [Burke's parents] both denied it, was there any further investigation of where the contraband and the key did come from, or do you assume that that was a false statement as well?
>
> A.    Since it was based on information that we had gotten from interviews, we had no further leads regarding where he had managed to get that from.

(Transcript of Agent Hardgrave's Grand Jury Testimony, at 63-64.)  Burke characterizes this testimony as mistaken at best and at worst, deliberately false and misleading.  There were other purported sources for the handcuff key, he points out, and Hardgrave's "no further leads" statement is therefore false.  The impropriety was compounded, Burke urges, when a grand juror asked Hardgrave directly, "You have any proof that Burke did have the key?"  Hardgrave's answer, and the follow-up colloquy, were as follows:

> A.    Other than the particular statements that we have indicating that he did, and we haven't had any statements form [sic] any other people indicating anyone else.
>
> Q.    But you never–
>
> A.    His name keeps coming up.
>
> Q.    But you haven't had no proof that he had the key in his hand, right?
>
> A.    No proof that Burke himself had the key?
>
> Q.    Yes.
>
> A.    That's correct.

(*Id.* at 65-66.)

The government acknowledges that FBI agents took statements from a large number of individuals, some of whom did provide information concerning the involvement of persons other than Defendant Burke in furnishing Erickson with a handcuff key.  Agent Hardgrave did not intentionally mislead the grand jury, however, the government contends, because those other leads fell apart under scrutiny.  James Wells, an inmate who told the FBI that he saw Erickson's brother give him the key, did not have a visiting day at the time he claimed this exchange took place and could not have made such an observation.  Similarly, records show that Andrew Traeger, who told the FBI that he saw another inmate pass the key to Erickson in a holding pen in the MCC, was not in fact in a holding pen on the day he claims.  Burke identifies other "leads" in Exhibit B to his renewed motion to dismiss the indictment; but, as AUSA MacArthur explained at oral argument on

October 25, 2002 each of these either related to a demonstrably false rumor that the key came from the key ring of a deputy U.S. Marshal assigned to escort Erickson, or was consistent with the government's theory that Burke provided the key. The court notes that the follow-up questions asked by the grand juror, quoted above, reveal that he or she was not misled by Hardgrave, who forthrightly acknowledged that apart from statements, the government had "no proof that Burke himself had the key."

Nor does the court share Burke's suspicions about the conduct of the prosecutor in the grand jury proceedings. At one point during Agent Hardgrave's testimony, a grand juror referred to testimony that Erickson had said "he wanted to escape to be with his dead wife," and asked Hardgrave to explain, "How's Mr. Burke going to get paid from a dead man?" (*Id.* at 57.) AUSA MacArthur interrupted the answer to this question and elicited testimony that "the FBI has received information from a variety of sources that payment for the key may have come from sources outside of the MCC." (*Id.* at 58.) Agent Hardgrave himself explained, further, that "previous statements . . . indicated that Mr. Burke may not have been fully aware of what Erickson meant what [sic] he said he meant to rejoin his wife." (*Id.*) A few moments later, Agent Hardgrave amplified that answer still further, explaining:

> He understood—it was my understanding that Burke knew that Erickson was going to escape. I don't think he expected it to turn into a gunfight in the basement of this building. And I don't think that if he thought it was going to be a gunfight, that Erickson was going to kill himself at that time.

(*Id.* at 60.) AUSA MacArthur then invited the juror who had raised the matter whether that juror had any follow-up question. (*Id.* at 59.) The juror declined to question Hardgrave on that matter further, but the grand jury foreperson asked whether that juror had "a question with, let's say, hearsay as opposed to testimony." (*Id.*) Agent Hardgrave's testimony was interrupted while AUSA MacArthur answered that question. At Burke's request, the court directed the government to obtain a transcript of the minutes from AUSA MacArthur's colloquy with the grand jury. Those minutes,

produced on the morning of October 28, 2002 demonstrate that Ms. MacArthur's comments were no more than a straightforward explanation that "[f]irst and foremost," the grand jury was to "consider this amongst yourselves," but that in determining the existence of probable cause for an indictment, the grand jury is entitled to consider hearsay. (Excerpt – Between Hardgrave Testimony – Minutes Transcript of March 12, 2002, at 2.) When a juror raised with Ms. MacArthur a question concerning interviews of Burke's parents, she immediately invited the agent to return to the grand jury room to give further testimony. (*Id.* at 4.)

The court sees no evidence of impropriety here, nor does the court agree that any further evidentiary hearing is necessary or appropriate. After reviewing the minutes, all that Burke's own attorney could offer was the suggestion that Ms. MacArthur should have been prompted by the grand juror's question to remind the grand jurors that they themselves have the right and authority to seek non-hearsay evidence by issuing subpoenas. Burke's counsel himself pointed out, however, that this is a right that grand jurors rarely exercise, and there is no basis for the suspicion that these grand jurors were unaware of their authority.

In asking the court to dismiss Count Five of the indictment on the basis of any perceived improprieties, Burke faces a heavy burden. The Supreme Court has imposed limits on the authority of the lower courts to exercise supervisory powers as a means of imposing preferred policies on grand jury investigations. *United States v. Gillespie*, 974 F.2d 796, 800 (7th Cir. 1992), citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988); and *United States v. Williams*, 504 U.S. 36 (1992). In *Bank of Nova Scotia*, the district court concluded that IRS agents gave misleading and inaccurate summaries to the grand jury just prior to the indictment of the bank and several individuals on mail and tax fraud charges, including "summaries" of evidence that had not in fact been presented to the grand jury in prior testimony. The Supreme Court nevertheless reversed a dismissal of the indictment, noting that the court may not look beyond the indictment to weigh the "reliability or competence of the evidence presented to the grand jury." 487 U.S. at

14

263. More recently, in *United States v. Williams*, 504 U.S. 36 (1992), the Supreme Court held that a district court may not dismiss an otherwise valid indictment because the government failed to disclose substantial exculpatory evidence in its possession to the grand jury. Unless the government knew that evidence offered to the grand jury was false, there is no basis for the court to dismiss the indictment. In an earlier case similar to this one, *United States v. Cathey*, 591 F.2d 268 (5th Cir. 1979), the court concluded that the district court properly refused to dismiss a tax evasion indictment on grounds that an IRS agent gave arguably inaccurate testimony to the grand jury. In *Cathey*, as in this case, the district court had found no evidence that the agent "'deliberately attempted to mislead, certainly no evidence of perjury.'" *Id.* at 272.

Authorities that Burke cited, both in his written submissions and in oral argument on Friday, October 24, are not to the contrary. Most of those authorities pre-date the *Bank of Nova Scotia* and *Williams* cases. First, *Mesarosh v. United States*, 352 U.S. 1 (1956) did not involve grand jury proceedings at all; there, the Court held there that false testimony given by a paid government witness so tainted the trial that convictions of Smith Act violations had to be reversed. *United States v. Liebowitz*, 420 F.2d 39 (2d Cir. 1969), did involve a challenge to an indictment that the prosecutor obtained relying principally on hearsay, rather than available direct evidence. Defendant appealed from his conviction on this basis, but the court was unmoved: It noted that there was no basis for concluding the grand jury had been misled about the nature of the evidence presented to it, nor had defendant demonstrated that with eyewitness testimony he would not have been indicted. 420 F.2d at 42. Here, similarly, Burke has not suggested that the government had non-hearsay evidence available to it, nor has he demonstrated that other evidence would have led to a different result before the grand jury on Count Five.

In *United States v. Asdrubal-Herrera*, 470 F.Supp. 939 (N.D. Ill.1979), the prosecution negligently presented false testimony that misled the grand jury into believing that the defendant, who was charged with immigration offenses, was a dealer in firearms. The court held that the false

testimony biased the grand jury, depriving the defendant of his right to an "independent and informed" grand jury. *Id.* at 942. The court therefore exercised its supervisory powers and dismissed the indictment. In *United States v. Hogan*, 712 F.2d 757 (2d Cir.1983), the defendant was convicted of conspiracy to possess with intent to distribute heroin. The prosecution presented extensive hearsay and double hearsay to the grand jury regarding the defendant's involvement in two unrelated murders, and his corrupt activities as a policeman. When a grand juror inquired why the government was prosecuting the defendant if the drug deal had fallen through, the prosecutor called the defendant a "real hoodlum," who should be indicted "as a matter of equity." *Id.* at 760. The court dismissed the indictment in that case, based on the prosecutor's misconduct, which the court characterized as "flagrant and unconscionable." *Id.* at 762. Assuming that *Hogan* and *Asdrubal* remain good law, the court does not believe they require dismissal of the indictment here. Burke does not suggest the prosecutor used improper pejorative language about him or presented evidence concerning crimes unrelated to the perjury charges.

Seventh Circuit cases decided since *Hogan* and *Asdrubal* confirm that an indictment may be dismissed where the prosecutor "manipulated a grand jury by willfully misleading it or knowingly presenting false evidence," but only where defendant is prejudiced by the misconduct. *United States v. Udziela*, 671 F.2d 995, 998 (7th Cir. 1982). The *Udziela* court upheld denial of the defendant's motion to dismiss the indictment where prosecutors learned only a day before the trial that a witness had lied before the grand jury, and where there was ample additional evidence to support the indictment. Although Burke here quarrels with the language of Agent Hardgrave's testimony, he does not suggest Hardgrave committed perjury, and the court does not believe AUSA MacArthur's conduct can be characterized as "willfully misleading."

In *United States v. Roth*, 777 F.2d 1200 (7th Cir. 1985), the prosecutor and case agent falsely advised the grand jury that the names of persons conspiring with the defendant were unknown, when in fact law enforcement officers had a "strong suspicion" concerning the identity

16

and number of co-conspirators. Despite its "feeling of unease about the government's conduct," the court concluded the conduct did not constitute suborning perjury or any "other sort of outrageous or intentional misconduct that would justify ordering the indictment dismissed. . . ." *Id.* at 1206. Ten years later, in *United States v. Anderson*, 61 F.3d 1290 (7th Cir. 1995), the court considered a record which showed that the prosecutor arguably misstated the law when he told the grand jurors it was illegal for defendant to possess a precursor chemical. The law in fact prohibits such possession only where the defendant knew or reasonably believed the chemical would be used to manufacture a controlled substance. Defendant had not properly preserved his objection to the prosecutor's statement, but in any case the court was willing to consider the full context of the prosecutor's comments in reaching the conclusion that the government was relying not only on defendant's possession of the precursor but also on the inference that there was only one use for the chemical, an unlawful one. *Id.* at 1297.

United States v. Signa Intern., Inc., 244 F.3d 841 (11th Cir. 2001), on which Burke relies, has been vacated and is, in the words of the court that decided it, "officially gone." *United States v. Sigma Intern., Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002). The court notes, however, that the conduct resulting in a dismissal of the indictment there was far more egregious than what is before this court. The court noted that the prosecutor had (a) implied to a successor grand jury that the previous jury had wanted to indict the defendant, but had been prevented from doing so, (b) presented a large amount of informal unsworn testimony himself, and (c) requested that a complex indictment be returned in only two days. None of these circumstances are present here.

In determining whether Burke was prejudiced by any misconduct on the part of the government, the court must consider whether such misconduct "had an effect on the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 263. Viewed in context, the court believes there was no such effect here. The minutes of AUSA MacArthur's comments show no more than a straightforward and accurate statement of the law allowing grand jurors to consider hearsay.

17

When grand jurors asked her a factual question, Ms. MacArthur immediately called the witness back for further testimony. At the time Agent Hardgrave gave his testimony, the grand jury had transcripts of other witnesses' testimony available to them. Although he testified that Burke expected Erickson would use the handcuff key to escape, Agent Hardgrave also explained that he had no direct evidence that the murders and Erickson's suicide were foreseeable to Burke. Where Hardgrave was forthcoming in explaining what evidence the government had (and what evidence it did not have) of Burke's involvement in providing a key to Erickson, the fact that Agent Hardgrave did not simultaneously remind the grand jurors of other false leads generates no concern that the decision to indict Burke was a product of any government violations.

## CONCLUSION

For the foregoing reasons, Defendant's motion regarding the grand jury (36-1) and motion for an evidentiary hearing (45-1) are granted in part and denied in part. His motion to suppress grand jury statements (Doc. No. 44-1) and motions to dismiss the superseding indictment (Doc. 44-2, 45-2) are denied. Finally, Defendant's renewed request for production of grand jury minutes is granted in part and denied in part. His renewed request for an evidentiary hearing and renewed motion to dismiss superseding indictment are denied.

ENTER:

Dated: October 30, 2002

REBECCA R. PALLMEYER
United States District Judge

18

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 1049 - 1 | **DATE** | 11/20/2002 |
| **CASE TITLE** | USA vs. Robert A. Burke | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

| | | |
|---|---|---|
| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due ___. Reply to answer brief due _____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on ___ set for ___ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on ___ set for ___ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)　☐ Local Rule 41.1　☐ FRCP41(a)(1)　☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry]　Defendant's motion to strike certain inflammatory surplusage from the indictment (35-1) is denied. |
| (11) | ■ | [For further detail see order on the reverse side of the original minute order.] |

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | NOV 21 2002 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | 164 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 11/25/2002 | |
| | | date mailed notice | |
| ETV | courtroom deputy's initials | ETV | |

U.S. DISTRICT COURT
CLERK

FILED
02 NOV 21 AM 8:08

Date/time received in central clerk's office | mailing deputy initials

## ORDER

Some months ago Defendant Burke moved to strike what he characterizes as "inflammatory surplusage" in the indictment. Burke did not renew that motion and did not object to submission of a copy of the superseding indictment to the jury. The court nevertheless explains briefly why the motion is denied.

Burke's motion argued that paragraphs 7 and 8 of the indictment improperly include "considerable detail with respect to the exercise of Burke's Fifth Amendment privilege." Neither of the paragraphs at issue makes any explicit reference to the Fifth Amendment, and paragraph 8 says nothing at all about the matter of self-incrimination. Paragraph 7 does refer to the "privilege against self-incrimination," but does so in a fashion that merely explains the significance of the Chief Judge's Immunity Order. Under that Order, Burke was not excused from testifying, but the government was barred from using his truthful testimony as the basis for any prosecution. *See generally United States v. Apfelbaum*, 445 U.S. 115 (1980). The court concludes this language is neither inflammatory nor unnecessary to the jury's understanding of the charges.